Robert Lee **GREEN**, II, Appellant,

v.

**The STATE of Texas, State.**

**No. 2–01–304–CR.**

Court of Appeals of Texas, Fort Worth.

May 16, 2002.

---

Ronald D. Vanzura, Denton, for appellant.

Bruce Isaacks, Crim. Dist. Atty., Catherine Luft, Michael Moore, and Tony Paul, Asst. Dist. Attys., Denton, Matthew Paul, State Prosecuting Atty., Austin, for appellee.

PANEL A: DAY, and WALKER, JJ.; and WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment).

## OPINION

SUE WALKER, Justice.

### I. INTRODUCTION.

Robert Lee Green, II ("Green") appeals his conviction for possession of less than one gram of methamphetamine. In two points, he challenges the legal and factual sufficiency of the evidence underlying his conviction, and contends that the trial court erred in denying his motion to suppress because the police's forced entry into his home to execute unrelated misdemeanor arrest warrants was improper. We reverse.

### II. BACKGROUND.

On the morning of Wednesday September 20, 2000, the maintenance man of Denton North Apartments discovered a hypodermic syringe beside the concrete patio of apartment 3105–A. The apartment complex manager, Amber Parks ("Parks"), decided to phone the police. At approximately 10:00 a.m., Officer Lenn Carter of the Denton Police Department arrived with Officers Padilla and Kronenberger to investigate. Parks informed them that Green leased apartment 3105–A and that similar syringes had been found near his patio before. The officers ran a computer search on Green and learned that he had two outstanding arrest warrants for a traffic violation and for failing to appear in court on that violation. Based on this information, the officers decided to go to the apartment and execute the misdemeanor arrest warrants "if [Green] was at home."

Officer Carter and the maintenance man approached Green's front door and Officer Padilla positioned himself behind the apartment building in case Green attempted to escape from a window.[1] The maintenance man knocked on the door and a woman later identified as Sarah Yarborough ("Yarborough") answered. Officer Carter asked if Robert Green was home, and Yarborough indicated that he was at work. Officer Carter testified:

Q. Well, did you see Robert Green at that time?

A. No.

Q. How was that female acting at the door?

A. She repeatedly looked behind her and was hesitant to answer my questions.

Q. Okay. Was the door—as the female was standing in the doorway, was the door completely open, or how was the door?

A. She initially opened the door completely. When I told her why I was there, she closed the door slightly. She was informed that she had—that Mr. Green had a warrant for his arrest. Eventually she attempted to shut the door on me.

Q. What do you mean she attempted to shut the door? How did she do that?

A. She pushed the door to. I stepped forward and stopped the door from shutting.

1. From the record, Officer Kronenberger's whereabouts at this point is unclear.

Q. How did you do that?

A. Put my foot in the door.

After Officer Carter forcibly entered the apartment by placing his foot in the door, Yarborough retreated into the apartment yelling for Green to wake up. At that point, Officer Carter became concerned about his safety and saw someone lying on a sofa covered with a blanket in the front, living area. Officer Carter pursued Yarborough into the apartment.

After opening a back bedroom door, Officer Carter found Green asleep on a mattress and arrested him. A pat-down search incident to the arrest yielded a "little clear plastic baggie with [a] little white rock inside of it," which later tested positive as methamphetamine. Drug paraphernalia strewn around the bedroom in Officer Carter's plain view, including hypodermic syringes similar to the one found outside of Green's patio, crack pipes, and a marijuana cigarette rolling machine, also was seized.

In support of his motion to suppress, Green argued that misdemeanor arrest warrants for a traffic violation and for failing to appear cannot form the basis for entering a private residence to determine if there are controlled substances inside. The State responded that such warrants can authorize police entry into a person's home if the police believe the person is present at the time. Alternatively, the State contended that exigent circumstances created by Yarborough's behavior justified Officer Carter's entry into the apartment. The trial court overruled Green's motion to suppress and Officer Carter was permitted to testify to the events that unfolded after he entered the apartment.

After hearing all of the evidence, the jury convicted Green of possessing less than one gram of methamphetamine and

sentenced him to two years' confinement. This appeal followed.

### III. MOTION TO SUPPRESS.

#### A. Standard of Review.

In his second point, Green asserts that the trial court erred in denying his motion to suppress because "[a] traffic ticket warrant for speeding and attendant failure to appear warrant from a municipal court is insufficient for entry into a residence where the underlying facts suggest a controlled substance or drug paraphernalia offense."

We review the denial of a motion to suppress by giving almost total deference to a trial court's determination of historical facts and reviewing de novo the court's application of the law. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex.Crim. App.2000). When, as here, the trial court does not make explicit findings of historical facts, we review the evidence in the light most favorable to the trial court's ruling. *Id.* at 327–28. In determining whether the trial court's decision is supported by the record, we generally consider only evidence adduced at the suppression hearing because the ruling was based on it rather than evidence introduced later. *Rachal v. State*, 917 S.W.2d 799, 809 (Tex. Crim.App.), *cert. denied*, 519 U.S. 1043, 117 S.Ct. 614, 136 L.Ed.2d 539 (1996). Nevertheless, this general rule is inapplicable where, as in this case, the suppression issue is relitigated by the parties during the trial on the merits. *Id.* Then, we assess the trial court's ruling in light of the evidence presented at both the suppression hearing and the trial. *Id.*

#### B. Police Entry into a Private Residence: *Payton v. New York.*

The right of a man to retreat into his own home and to be free from unrea-

sonable governmental intrusion stands at the very core of the Fourth Amendment. *See Silverman v. United States,* 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734 (1961). The Fourth Amendment thus has drawn a firm line at the entrance to the house and, absent exigent circumstances, that threshold may not reasonably be crossed without a warrant. *See Payton v. New York,* 445 U.S. 573, 590, 100 S.Ct. 1371, 1382, 63 L.Ed.2d 639 (1980). Whether this warrant requirement may be satisfied by a misdemeanor arrest warrant for an unrelated offense is the issue before us. The basic blueprint for our analysis is found in *Payton v. New York. Id.* at 603, 100 S.Ct. at 1388.

■ In *Payton,* the Supreme Court granted certiorari to resolve a constitutional challenge brought against a New York statute which permitted police officers to enter private residences without a search or an arrest warrant in order to make arrests. *Id.* at 573, 100 S.Ct. at 1373. Holding the statute unconstitutional, the Court ruled that the Fourth Amendment prohibits police from making a warrantless and nonconsensual entry into a suspect's house in order to make a "routine felony arrest." *Id.* In its secondary holding, however, the court clarified that entry into a suspect's private residence is not unconstitutional if the police lack a search warrant but nevertheless possess a valid *arrest* warrant for the suspect. *Id.* at 603, 100 S.Ct. at 1388. This is because, for Fourth Amendment purposes, "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." *Id.* In reaching this rule, the *Payton* Court acknowledged that,

> [A]n arrest warrant requirement may afford less protection than a search warrant requirement, but it will suffice to

interpose the magistrate's determination of probable cause between the zealous officer and the citizen. If there is sufficient evidence of a citizen's participation in a felony to persuade a judicial officer that his arrest is justified, it is constitutionally reasonable to require him to open his doors to the officers of the law.

*Id.* at 602–03, 100 S.Ct. at 1388.

■ Thus, pursuant to *Payton,* a police officer may enter a suspect's private residence to execute a felony arrest warrant provided he reasonably believes the suspect is home. *Id.* Unlike the felony arrest warrant in *Payton,* the arrest warrants here are for misdemeanor offenses. We therefore must address whether *Payton's* rule of entry extends to misdemeanor arrest warrants.

## C. Does *Payton* authorize police entry into a private residence to execute a misdemeanor arrest warrant?

Green complains that arrest warrants for misdemeanor offenses wholly unrelated to the crime being investigated cannot justify police entry into a private residence absent consent or exigent circumstances. Consequently, Green makes two arguments. First, that misdemeanor arrest warrants cannot justify police entry into a private residence; and second, that police may not use misdemeanor arrest warrants pretextually to further an unrelated investigation. The State, on the other hand, asserts that the holding in *Payton* hinges on the idea of a magistrate's independent probable cause review, and therefore extends to all arrest warrants and not just to those issued for felony offenses.

■ Green's contention that police may not make pretextual use of arrest warrants to further an unrelated criminal investigation is subsumed within the two-pronged *Payton* analysis. In other words, if, as

required by *Payton*, police possess a valid arrest warrant and have a reasonable belief that the suspect resides at a particular location and is presently at that location, then the officer's subjective intent in executing the arrest warrant at the suspect's residence at that particular time, pretextual or not, is unchallengeable. *See, e.g.,* *United States v. Clayton*, 210 F.3d 841, 844 (8th Cir.2000) (holding "although Clayton's arrest warrant did not provide the police with probable cause to search his residence, the officers were justified in entering his home to arrest him notwithstanding their further subjective intent to investigate the anonymous tip regarding a possible methamphetamine laboratory and sawed-off shotgun"); *United States v. Causey*, 834 F.2d 1179, 1184 (5th Cir.1987) (holding "where police officers are objectively doing what they are legally authorized to do ... the results of their investigations are not to be called in question on the basis of any subjective intent with which they acted"); *see also Gordon v. State*, 801 S.W.2d 899, 909 (Tex.Crim.App. 1990) (citing *Causey*, 834 F.2d at 1184–85); *Maestas v. State*, 963 S.W.2d 151, 158 (Tex.App.-Corpus Christi 1998), *aff'd*, 987 S.W.2d 59, *cert. denied*, 528 U.S. 834, 120 S.Ct. 93, 145 L.Ed.2d 79 (1999) (holding that although officers were investigating defendant's involvement in a Texas murder at the time of her arrest pursuant to a Colorado felony warrant, the arrest was not invalid). We therefore decline to address Green's contention that the officers' use of the misdemeanor arrest warrants was pretextual outside the context of our *Payton* analysis.

█ Moving to Green's other argument, that the rule as stated in *Payton* applies only to arrest warrants for felonies and not misdemeanors, we note that this contention has been raised in many federal courts and always rejected. *See Clayton*, 210 F.3d at 843; *United States v. Spencer*, 684 F.2d 220, 223 (2d Cir.1982), *cert. denied*, 459 U.S. 1109, 103 S.Ct. 738, 74 L.Ed.2d 960 (1983); *United States v. Meindl*, 83 F.Supp.2d 1207, 1214 (D.Kan.1999); *Smith v. Tolley*, 960 F.Supp. 977, 991 (E.D.Va. 1997); *see also United States v. Albrektsen*, 151 F.3d 951, 953 (9th Cir.1998) (assuming, but not holding, that *Payton* applies to misdemeanor warrants); *Kain v. Nesbitt*, 156 F.3d 669, 672 (6th Cir.1998) (same); *Lyles v. City of Barling*, 17 F.Supp.2d 848, 855 & n. 6 (W.D.Ark.1998) (same), *aff'd*, 181 F.3d 914 (8th Cir.1999). Likewise, a number of state courts also have ruled that the *Payton* analysis applies equally to misdemeanor and felony arrest warrants. *See State v. Coma*, 133 Idaho 29, 981 P.2d 754, 756 (1999); *People v. LeBlanc*, 60 Cal.App.4th 157, 70 Cal. Rptr.2d 195, 199 (1997); *Archer v. Com.*, 26 Va.App. 1, 492 S.E.2d 826, 831 (1997).

These cases subscribe to the same logic espoused by the State; namely, that *Payton* stressed the necessity of a neutral magistrate's probable cause review to temper zealous law enforcement. *See e.g. Spencer*, 684 F.2d at 223; *Coma*, 981 P.2d at 757. A magistrate's probable cause assessment that a suspect participated in a crime—while not as optimal as the probable cause review associated with a search warrant in terms of Fourth Amendment rights protection—is safeguard enough to pass constitutional muster. *Payton*, 445 U.S. at 602–03, 100 S.Ct. at 1388. As a result, it is irrelevant whether the underlying offense for which the arrest warrant is secured is a felony or a misdemeanor, so long as the arrest warrant is founded on probable cause. *See Smith*, 960 F.Supp. at 991; *Spencer*, 684 F.2d at 223–24 (holding, "The concern has been to prevent the unreasonable seizure of a person or property. In determining reasonableness, the nature of the underlying offense is of no moment.").

In Texas, a misdemeanor capias is valid when issued from a court with proper jurisdiction after a neutral magistrate has made a determination of probable cause.[2] *See Sharp v. State,* 677 S.W.2d 513, 518 (Tex.Crim.App.1984); *see also Crane v. Texas,* 759 F.2d 412, 422 (5th Cir.), *modified on other grounds,* 766 F.2d 193 (5th Cir.), *cert. denied,* 474 U.S. 1020, 106 S.Ct. 570, 88 L.Ed.2d 555 (1985). The misdemeanor capias follows the same form and procedure as a felony warrant. TEX.CODE CRIM. PROC. ANN. art. 23.04 (Vernon 1989).

Green does not challenge the validity of the misdemeanor warrants issued for his traffic violation and his failure to appear. Copies of the warrants admitted at trial show that they were issued by a court with proper jurisdiction and signed by a municipal judge. *See Sharp,* 677 S.W.2d at 518. Thus, the record reflects that the municipal judge found sufficient evidence of Green's participation in the aforementioned misdemeanors to conclude that probable cause existed for his arrest. Although the judge's probable cause finding in this case spoke to the commission of offenses *other than* the offense charged (possession of methamphetamine), it nevertheless empowered police to find and arrest Green whenever and wherever they could. *See Shannon v. State,* 681 S.W.2d 142, 145 (Tex.App.-Houston [14th Dist.] 1984, pet. ref'd) (holding that an outstanding arrest warrant for an individual may be executed by law enforcement at whatever time and place they choose). Therefore, because Texas requires misdemeanor warrants to be predicated upon a finding of probable cause, and in light of our law's equal treatment of felony and misdemeanor warrants, we hold that the limited police authority recognized in *Payton* to enter a suspect's residence to execute an arrest warrant when police reasonably believe the suspect to be home applies to the execution of both felony and misdemeanor warrants. *See Payton,* 445 U.S. at 603, 100 S.Ct. at 1388.

**D. *Payton*'s Two Prongs: Reasonable Belief that the Location is the Suspect's Dwelling and Reason to Believe the Suspect is Present.**

Recall that *Payton* requires a two-part inquiry before police may enter a private residence to execute an arrest warrant: first, they must possess a reasonable belief that the residence is the suspect's dwelling; and second, the police must have "reason to believe" that the suspect is within the dwelling. *Id.; United States v. Magluta,* 44 F.3d 1530, 1533 (11th Cir.), *cert. denied,* 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995); *see also United States v. Risse,* 83 F.3d 212, 216 (8th Cir. 1996) (applying reasonableness standard to both *Payton* prongs); *United States v. Lauter,* 57 F.3d 212, 214 (2d Cir.1995) (same); *Valdez v. McPheters,* 172 F.3d 1220, 1225 (10th Cir.1999) (same); *Smith,* 960 F.Supp. at 984 (same); *State v. Miller,* 342 N.J.Super. 474, 777 A.2d 348, 363 (2001) (same); *Morgan v. State,* 963 S.W.2d 201, 204 (Tex.App.-Houston [14th Dist.] 1998, no pet.) (same); *Reno v. State,* 882 S.W.2d 106, 108 (Tex.App.-Fort Worth 1994, pet. ref'd) (in case where first *Payton* prong not at issue, applying reasonable basis standard to second *Payton* prong).

Although the "reason to believe" standard articulated in *Payton*'s second prong has yet to be defined by the Supreme Court, several federal courts have offered thoughtful and comprehensive definitions

---

**2.** Note that, for purposes of constitutional scrutiny, there is no substantive difference between an arrest warrant and a capias. *See*

*Coolidge v. New Hampshire,* 403 U.S. 443, 453, 91 S.Ct. 2022, 2031, 29 L.Ed.2d 564 (1971).

of their own. Prior to *Payton*, the Fifth Circuit recognized the right to enter a residence to execute an arrest warrant. *See United States v. Woods*, 560 F.2d 660, 665 (5th Cir.1977), *cert. denied*, 435 U.S. 906, 98 S.Ct. 1452, 55 L.Ed.2d 497 (1978). After resolving that the propriety of such entry is a question of reasonable belief rather than of probable cause, the *Woods* court sought to distinguish these two often-times nebulous standards:

> Probable cause is essentially a concept of reasonableness, but it has become a term of art in that it must always be determined by a magistrate unless exigent circumstances excuse a warrant.... Reasonable belief embodies the same standards of reasonableness but allows the officer, who has already been to the magistrate to secure an arrest warrant, to determine that the suspect is probably within certain premises without an additional trip to the magistrate.

*Woods*, 560 F.2d at 665. The Eleventh Circuit later relied on *Woods* in interpreting *Payton's* "reason to believe" language. *Magluta*, 44 F.3d at 1534–35. The court surmised:

> Due to the lack of authority on point, it is difficult to define the *Payton* "reason to believe" standard, or to compare the quantum of proof the standard requires with the proof that probable cause requires. We think it sufficient to hold that in order for law enforcement officials to enter a residence to execute an arrest warrant for a resident of the premises, the facts and circumstances within the knowledge of the law enforcement agents, when viewed in the totality, must warrant a reasonable belief that the location to be searched is the suspect's dwelling, and that the suspect is within the residence at the time of entry.... In evaluating this on the spot determination, as to the second *Payton*

prong, courts must be sensitive to common sense factors indicating a resident's presence.

*Id.* at 1535; *see also United States v. Route*, 104 F.3d 59, 62 (5th Cir.1997) (adhering to reasonable belief test articulated in *Woods* when deciding whether entry into residence to execute arrest warrant violates Fourth Amendment), *cert. denied*, 521 U.S. 1109, 117 S.Ct. 2491, 138 L.Ed.2d 998 (1997); *Morgan*, 963 S.W.2d at 204 (citing *Magluta* in holding that police were authorized to enter hotel room to execute felony arrest warrant); *Smith*, 960 F.Supp. at 988 (adopting *Magluta* reasonable belief standard). Under the *Woods* and *Magluta* standards, an officer's assessment of a suspect's whereabouts does not need to be correct, but merely grounded on the reasonable belief that the suspect resides at the dwelling and is currently there. *See Risse*, 83 F.3d at 216; *United States v. Terry*, 702 F.2d 299, 319 (2d Cir.1983), *cert. denied sub nom. Williams v. United States*, 461 U.S. 931, 103 S.Ct. 2095, 77 L.Ed.2d 304 (1983).

■ Here, the record is clear that Officers ₒCarter, Padilla, and Kronenberger had a reasonable belief that Green resided at apartment 3105–A. Parks testified at trial that she showed the officers information confirming that Green currently leased apartment 3105–A. The lease agreement for apartment 3105–A bears Green's signature. Viewing the totality of the facts known to Officer Carter, as reflected in the record before us, we conclude they support a reasonable belief that Green resided at apartment 3105–A. Thus, *Payton's* first prong is satisfied.

■ Turning to the second prong of the *Payton* test, we must analyze whether, given the totality of the facts and circumstances known to Officer Carter, they demonstrate he had a reasonable basis for believing Green actually was within the

apartment at the time he forcibly entered it by placing his foot in the door. To satisfy this prong, direct surveillance or the actual viewing of the suspect on the premises is not required. *Magluta*, 44 F.3d at 1538; *Valdez*, 172 F.3d at 1226 n. 2. Indeed, officers may take into account the fact that a person involved in criminal activity may be attempting to conceal his whereabouts. *See Magluta*, 44 F.3d at 1538. Nor are police required to rely on statements that a suspect is not at home. *See People v. Sprovieri*, 95 Ill.App.2d 10, 238 N.E.2d 115, 118 (1968), *aff'd*, 43 Ill.2d 223, 252 N.E.2d 531 (1969); *State v. Pontier*, 95 Idaho 707, 518 P.2d 969, 976 (1974). Furthermore, a visitor's presence at a residence may reasonably lead police to conclude that the resident is at home. *Magluta*, 44 F.3d at 1538.

Under certain circumstances, the presence of an automobile at the residence may also give rise to a reasonable belief that a suspect is home. *See Route*, 104 F.3d at 63 (recognizing that police had reason to believe suspect at home where, after suspect's roommate left, they could hear television inside and another car remained in the driveway); *Magluta*, 44 F.3d at 1537–38 (recognizing that presence of white van during entire period of surveillance supported reasonableness of belief that suspect was home when van was connected to suspect); *United States v. Morehead*, 959 F.2d 1489, 1496 (10th Cir.1992) (holding that car in suspect's carport and truck in front of suspect's house afforded police reason to believe suspect was at home), *aff'd on other grounds sub nom. United States v. Hill*, 971 F.2d 1461 (1992); *United States v. De Parias*, 805 F.2d 1447, 1457 (11th Cir.1986) (holding reasonable belief standard satisfied where apartment manager informed officers that the De Pariases were home if a certain car was parked in front of the apartment) (ruling that suspect's car parked "nearby" his apart-

ment at 7:30 a.m. gave police reason to believe suspect was home), *cert. denied sub nom. Ramirez v. United States*, 482 U.S. 916, 107 S.Ct. 3189, 96 L.Ed.2d 678 (1987); *United States v. Beck*, 729 F.2d 1329, 1331–32 (11th Cir.), *cert. denied*, 469 U.S. 981, 105 S.Ct. 383, 83 L.Ed.2d 318 (1984).

Moreover, officers may reasonably believe that a person is home at certain times of the day. *See Terry*, 702 F.2d at 319 (holding it reasonable to believe suspect would be home at 8:45 a.m. on a Sunday morning); *Smith*, 960 F.Supp. at 988 (noting that by going to suspect's house at 10:30 p.m. on a Monday night, officer presented himself "at a time of day on a day of the week when most people are presumed to be at home"); *United States v. Edmonds*, 52 F.3d 1236, 1248 (3d Cir.1995) (noting, "The agents came to the apartment to arrest Carlton Love at 6:45 a.m., early enough that it was unlikely someone living in the apartment would have already departed for the day."), *vacated, on reh'g on other grounds, cert. denied*, 519 U.S. 927, 117 S.Ct. 295, 136 L.Ed.2d 214 (1996); *but see Miller*, 777 A.2d at 364 (holding that early morning hour alone will not constitute reasonable basis for believing suspect to be home).

Police observance of lights or other electrical devices may prove significant as well. *See Route*, 104 F.3d at 63 (noting officers heard television set left on inside residence after third person left residence); *Magluta*, 44 F.3d at 1538 (holding observation that "the lawn was manicured and a porch light was on," when coupled with a visitor and a car parked at home, gave "no indication that Magluta departed, such as for work or the like"); *Morgan*, 963 S.W.2d at 204 (holding the officers had reasonable basis for believing suspect was in hotel room where hotel manager said suspect and sister were in room and they heard

the t.v. and people moving around inside of room); *Reno,* 882 S.W.2d at 108 (holding when officers peered through window and saw television set on and several beer bottles on table, they had reason to believe Reno was inside apartment); *compare State v. Peacher,* 167 W.Va. 540, 280 S.E.2d 559, 571 (1981) (holding that police had no basis for entry into defendant's house trailer because observations that door was locked and air conditioner running were "ambiguous indicators at best" of defendant's current presence in trailer).

■ Additionally, the circumstances of a suspect's employment may be factored into an officer's spot determination of the suspect's presence. *Lauter,* 57 F.3d at 215 (holding officer's conduct reasonable since he knew the suspect "was unemployed and typically slept late"); *Woods,* 560 F.2d at 665 (holding that it is reasonable to believe suspect would be "at his place of abode, especially at 8:30 in the morning for a man not known to be working").

In our appraisal of reasonable belief, no single factor is dispositive. As discussed, we must examine all of the facts and circumstances within the officers' knowledge at the time of entry and be particularly sensitive to common sense factors indicating a resident's presence. *Magluta,* 44 F.3d at 1535. Bearing this standard in mind, we return to the facts at hand.

■ Here, the record reflects that when Officer Carter stood at the threshold of Green's doorway shortly after 10:00 a.m. on a Wednesday, he had no indication Green was at home. Officer Carter knew nothing of Green's employment status or habits. The record does not reflect that Parks furnished the officers with any in-formation concerning Green's employment or unemployment, or that she briefed them on any of Green's routine comings and goings. The midmorning hour, in the absence of knowledge of Green's work schedule, if any, does not support an inference or reasonable belief that Green was home at 10:00 a.m. on a Wednesday.

Officer Carter furthermore knew nothing about the make and model of Green's car, or if Green even possessed a car. Again, the record does not indicate that Parks provided this information to the officers. In addition, Officer Carter's testimony is devoid of any suggestion that he saw lights on inside or outside of the apartment, or that he detected any kind of motion within.

Yarborough's act of opening the door adds nothing to Officer Carter's belief concerning Green's presence in the apartment because Yarborough could have been either a visitor or a roommate. Parks testified that it is typical for two people to live in each of the complex's 201 apartments. Moreover, Officer Carter did not ask Yarborough to identify herself until *after* he had entered the apartment and arrested Green. Yarborough's simple presence, therefore, sheds no light on Green's.

Officer Carter testified that Yarborough initially placed Green at work, and that she appeared preoccupied with the room behind her and hesitant to answer questions. Officer Carter was not required to accept Yarborough's representation that Green was at work. Yet, Officer Carter articulated no facts, and the record before us contains no facts other than Yarborough's demeanor, supporting his belief that Green was inside the apartment.[3]

---

**3.** Although Officer Carter testified to seeing someone lying on the sofa covered with a blanket, he did not see this person until *after* he placed his foot in the door and forcibly entered the apartment. Our focus is on the totality of the facts and circumstances known to the officer *before* the entry. *Magluta,* 44 F.3d at 1535. Consequently, information

■ The Fourth Amendment requires that police seeking entry into a suspect's private residence to execute an arrest warrant possess some objective basis for believing the suspect is present; disbelief of a representation that the suspect is not home, standing alone, is not enough. *See Smith,* 960 F.Supp. at 989 (holding police possessed a reasonable belief wife was at home despite husband's assertions that she was not when they observed multiple cars parked by the house, three people inside, and husband met them on the driveway to fend off their questions); *Spencer,* 684 F.2d at 222 (holding police possessed a reasonable belief defendant was present despite grandfather's statement that he did not know if defendant was home when defendant's girlfriend thirty-five minutes earlier had said defendant was home); *Pontier,* 518 P.2d at 976 (holding police possessed reasonable belief husband was home despite wife's statement that he had gone hunting when they observed shotguns and a hunting vest in plain view); *State v. Hiralez,* 27 Ariz.App. 393, 555 P.2d 362, 364–65 (1976) (holding police possessed reasonable belief suspect was at home despite statement by person who answered door and kept nervously glancing back into the house that suspect was not at home when warrant was executed at 9:50 p.m. on a Wednesday because that was an hour and day of week when officers could reasonably expect suspect to be home); *see also Miller,* 777 A.2d at 363 (holding on state grounds that police did not have reasonable basis to believe suspect was at home where woman answering door said that suspect was gone and they observed nothing that independently confirmed she was lying).

The record before us, deferring to the trial court's finding of historical facts, simply does not demonstrate any facts or circumstances supporting a reasonable belief by Officer Carter that Green was in the apartment. Our research has revealed no case supporting the proposition that Yarborough's demeanor, standing alone, absent any additional indicia suggesting the likelihood of Green's presence, gives rise to a reasonable belief Green was present in the apartment. To the contrary, the cases addressing the issue require that nervous behavior by the person answering the door be coupled with some other indicia, however minor, that the suspect is present in order to generate a reasonable belief the suspect is home. *See, e.g., Miller,* 777 A.2d at 363 (holding officer's belief that person was lying was not enough standing alone to support reasonable belief suspect was home); *Hiralez,* 555 P.2d at 364–65 (holding statement by person who answered door and kept nervously glancing back into the house that suspect was not at home when coupled with fact that warrant was executed at 9:50 p.m. on a Wednesday gave rise to reasonable belief suspect was home); *see also, e.g., Smith,* 960 F.Supp. at 989 (husband's refusal to answer questions, coupled with facts that time was 10:30 p.m. on a Monday and officer saw three persons inside home, gave rise to reasonable belief suspect was home). To hold otherwise would subject traditionally protected residential property to undue police invasion based on mere nervousness by a person who answers the door and finds a uniformed police officer on the doorstep. We hold that the Fourth Amendment requires some sounder basis for believing the suspect is in the dwelling than merely a nervous demeanor by the person answering the door. *Payton*'s second prong is not satisfied by the record before us. Consequently, the officers were

---

gained *after* the entry is not relevant to our determination of reasonable belief and cannot

be used to establish the legality of the officer's actions. *See Valdez,* 172 F.3d at 1226 n. 3.

precluded from entering Green's home to execute the arrest warrant. *Payton,* 445 U.S. at 603, 100 S.Ct. at 1388; *Miller,* 777 A.2d at 364.

 In the alternative to its argument that Officer Carter possessed a reasonable belief Green was in the apartment, the State contends that exigent circumstances created when Yarborough ran through the apartment justified the entry. In this case, however, any exigency arising from Yarborough's retreat was created solely by Officer Carter's improper action of preventing the door from closing. *See State v. Morse,* 125 N.H. 403, 408, 480 A.2d 183, (N.H.1984); *Green v. State,* 666 S.W.2d 291, 294 (Tex.App.-Houston [14th Dist.] 1984, no pet.) (holding that, where entry is justified, it must be on a basis other than a contrived emergency), *disapproved of on other grounds, Messer v. State,* 729 S.W.2d 694, 698 (Tex.Crim.App.1986); *Spears v. State,* 801 S.W.2d 571, 574 (Tex.App.-Fort Worth 1990, pet. ref'd) (noting that the reasonableness of an officer's emergency entry onto premises of another is judged by the circumstances as they existed *at the time the decision was made to enter*). We therefore cannot agree with the State's contention that even if Officer Carter possessed no reasonable belief Green was home, he nonetheless was justified in entering the apartment based on exigent circumstances.

For the reasons explained above, we hold that the trial court abused its discretion by denying Green's motion to suppress. We sustain Green's second point.

### IV. CONCLUSION.

In light of our disposition of Green's second point, we do not reach his first point concerning the factual and legal sufficiency of the evidence supporting his conviction. Having sustained Green's second

point, we reverse the trial court's judgment and remand for a new trial.